IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

HERMAN SAUNDERS                                                                    PETITIONER

VERSUS                                                        CIVIL ACTION NO.  2:02cv558-KS-RHW

EMMITT L. SPARKMAN, et al.                                                   RESPONDENTS

**PROPOSED FINDINGS OF FACT AND RECOMMENDATION
PURSUANT TO REMAND**

BEFORE THE COURT is the Application of Herman Saunders for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, filed July 9, 2002, following remand to this Court by the Court of Appeals for further proceedings with respect to Saunders' challenge to the sufficiency of evidence to support his capital murder conviction of Natasha Cole and to the jury instructions associated with that charge.  Based upon this Court's examination of all the testimony adduced at Saunders' trial, review of the jury instructions given by the state court, and consideration of applicable law, this Court finds the petition should be denied.

FACTS AND PROCEDURAL HISTORY

On February 25, 1994, the grand jury of Lamar County, Mississippi indicted Herman Saunders, a/k/a Robert Marsh, a/k/a Mickey Marsh, a/k/a Adrian Marsh, as an habitual offender,[1] for conspiracy (Count I)[2] and two counts of capital murder (Counts II and III).  [R. Vol. 1, pp.

---

[1]Miss. Code Ann. § 99-19-81 provides that one convicted of a felony who has twice been previously convicted of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times, and who shall have been sentenced to separate terms of one year or more in any state and/or federal penal institution, shall be sentenced to the maximum term of imprisonment for such felony, without reduction or suspension or eligibility for parole or probation.  Pursuant to that statute, Saunders' indictment alleges his prior convictions on November 29, 1989 of two felony charges of sale of a controlled substance in Forrest County, Mississippi cause numbers 13747 and 13748, arising from separate incidents, in which he was sentenced to separate five-year terms in custody of the Mississippi Department of Corrections.  [R. Vol. 1, pp. 31, 33]

[2]Prior to commencement of trial, the State decided not to pursue the conspiracy count.  [R. Vol. 6, p. 56]

1

131-134]  On motion of the State, the indictment was later amended to correct typographic errors.  [R. Vol. 1, pp. 53-57, 93]   The indictment charged that in October 1993, Saunders hired Danny Porter and Carlos Stewart to murder Bennie Brown, Sr., and that Saunders assisted, aided, abetted, and encouraged the murder of Natasha D. Cole, which occurred during the act of the murder of Bennie Brown, Sr., "by then and there offering to pay and later paying" Porter and Stewart for the murder of Brown, in violation of Miss. Code Ann. § 97-3-19(2)(d).

On April 3, 1997, a jury convicted Saunders of the capital murders of both Brown and Cole [R. Vol. 4, pp. 495-496], however, the jury members were unable to unanimously agree on sentence for either of the crimes.  [R. Vol. 4, pp. 549-550]  After finding Saunders to be an habitual offender, the Circuit Court Judge sentenced Saunders to serve two consecutive life sentences in custody of the Mississippi Department of Corrections without possibility of parole, probation or early release.  [R. Vol. 4, pp. 551-554]  Saunders appealed, assigning as error the trial court's:

    (1)    applying the murder for hire statute to the killing of a chance victim;

    (2)    admitting evidence of prior bad acts;

    (3)    allowing testimony regarding Saunders' status as an habitual offender;

    (4)    allowing the calling of a witness expected to invoke his Fifth Amendment rights;

    (5)    admitting hearsay evidence of a co-conspirator's prior conviction.

The Mississippi Court of Appeals affirmed on December 30, 1998, and denied rehearing on April 20, 1999.  *Saunders v. State*, 733 So. 2d 325 (Miss. App. 1999).  Saunders filed no petition for certiorari to the U.S. Supreme  Court.

Saunders first filed for federal habeas relief on April 19, 2000, in the Northern District of Mississippi, Civil Action No. 4:00mc8JAD. That case was transferred to, and filed in the Southern District as Civil Action No. 2:00cv137PG on June 5, 2000. The issues in that petition were identical to those Saunders raised on direct appeal, *i.e.*, that (1) the evidence was insufficient to support his conviction of capital murder of Natasha Cole; (2) his conviction/sentence violate due process because the trial court allowed evidence of other offenses, *i.e.*, that Saunders told Stewart and Porter to kill Nakia Mason, who witnessed Saunders paying Stewart and Porter after Brown's murder, and evidence that Saunders was an habitual offender; (3) the trial court violated Petitioner's Sixth Amendment right to confront witnesses by permitting Danny Porter to take the stand and plead the Fifth Amendment when asked, "Were you and Carlos Stewart hired by Herman Saunders to kill Bennie Brown, Sr.?";[3] and (4) the trial court's allowing Carlos Stewart to testify that Danny Porter was a convicted felon violated the confrontation clause of the Sixth and Fourteenth Amendments. On July 18, 2000, Saunders moved to dismiss this first petition "without prejudice" so he could return to state court to seek post-conviction relief. The Court dismissed Civil Action No. 2:00cv137PG on August 2, 2000, but warned Saunders that the time which had passed between the date his conviction became final and the filing of any application for State court relief "counted against the one-year period of limitation."

On October 2, 2000, Saunders filed application to the Mississippi Supreme Court for leave to file a post-conviction motion in the state trial court asserting five grounds: that the indictment was defective in failing to allege that he "unlawfully and feloniously and of his malice

---

[3]This is the only question Porter was asked.

3

aforethought aid, abet and assist" the men he hired to kill Brown, and in charging him in Court III only with Mississippi Code Ann. § 97-3-19(2); that the defective indictment deprived the trial court of jurisdiction to try and sentence him; that his counsel was ineffective for failing to object to the defective indictment; and that no bifurcated hearing was held to determine his habitual offender status. On July 16, 2001, the Mississippi Supreme Court denied Saunders' application, finding all his claims procedurally barred except for the claim of ineffective assistance of counsel, and finding that claim to be without merit. On July 9, 2002, Saunders filed the habeas petition now before this Court. Pursuant to the remand from the Fifth Circuit Court of Appeals, the Court addresses Saunders' sufficiency of evidence claim as to his conviction of capital murder of Natasha Cole, and the jury instructions associated with that charge.

**Sufficiency of evidence to support conviction of capital murder of Natasha Cole**

As the following outline of the trial evidence shows, Saunders correctly asserted the evidence showed only that he contracted to have Porter and Stewart kill Bennie Brown; that no evidence showed he specifically hired them to kill Natasha Cole; and that his hirelings killed Cole to avoid being identified as Brown's murderers. Saunders urges that since the contract was only for the killing of Brown, he could not be charged or convicted of capital murder of Cole, a question of law.

Twenty-four year-old Carlos Stewart, also known as "Charlie Brown," testified that in October 1993, he was working as a cement finisher with his father, and lived in the Choctaw Apartments in Oak Grove in Lamar County, Mississippi. Originally from Hattiesburg, Stewart had known Danny Porter (aka Danny Soul) since childhood. Porter was staying with Stewart in October 1993. [R. Vol. 8, pp. 334-335, 379, 385-386] Stewart did not know Herman Saunders

until he met him about two weeks before the murders of Bennie Brown, Sr. and Natasha Cole. Stewart met Saunders when he drove Porter to Saunders' mother's house in a suburb of Hattiesburg known as Palmer's Crossing, so that Porter could sell Saunders a gun.[4] Saunders got into Stewart's car with Stewart and Porter, they drove a few blocks and Saunders fired the gun to see if it would shoot before he bought it from Porter. Stewart then drove back to the mother's house and parked. On this occasion, Saunders told Porter he wanted to have someone killed, though the conversation was vague and no details were given. [R. Vol. 8, pp. 336-337, 339]

About a week later, Porter and Stewart were again in Palmer's Crossing down behind the Club High Hat at an area known as the "hangout" where guys hung out and drank. Saunders was there when Porter and Stewart arrived, and Saunders and Porter took a walk. When they returned, Porter and Stewart left, and Porter related to Stewart that Saunders would pay each of them $3000.00 to kill someone. [R. Vol. 8, pp. 339-340]

The night before the murders (Friday, October 29, 1993), the three met on West Fourth Street, where Saunders parked his Blazer and got into Stewart's car. They drove to an apartment complex on West Fourth where Saunders wanted to get a second gun for Porter and Stewart because all they had was Stewart's 9 millimeter Glock, but Saunders was unable to find the person he sought. On this occasion, Saunders gave Porter and Stewart more details of the job he wanted them to do. He related that he, Saunders, had shot out the window of Bennie Brown, Sr.'s car in Meridian, MS, and that Brown was pressing aggravating assault charges against Saunders. Saunders wanted Brown killed because court was coming up the following Monday

---

[4] Stewart testified Porter was close friends with Saunders. Stewart had seen photographs of the two together. [R. Vol. 8, p. 433]

5

(November 1, 1993), and Saunders did not want to go to jail.[5]  Porter said he had known Brown, that he had owed Brown a bail,[6] but neither Porter nor Stewart knew where Brown lived.  Riding with them, Saunders showed Porter and Stewart the way to the front of Bennie Brown's house, told them Brown drove a red Porsche and that if the car was there, Brown was there.  Saunders told Porter and Stewart it would be better for them to come down the highway and walk through the woods to the rear of Brown's house. [R. Vol. 8, pp. 340-342]   Stewart drove back to the house on West Fourth where Saunders got out of the car.  Saunders told Stewart and Porter that once they had done the job and it was all over, they should get in touch with Saunders on his cell phone.  Porter knew the cell phone number.  Porter and Stewart returned to Brown's house but the Porsche was not there.  After unsuccessfully trying to find Brown's telephone number to call the house to find out if he were at home, they decided they would not do the job that night, and went to a club in Palmer's Crossing.  [R. Vol. 8, pp.  342-343]

 The next morning (Saturday, October 30, 1993), between 9:30 and 10:00 a.m., Stewart and Porter drove to the Highway 59 exit from Highway 98 and down to the Highway 11 (South Hattiesburg) exit, where they turned around and traveled north on Highway 59.  When they got behind Brown's house, they pulled the car over to the curb, got out and walked through the tree line which was about 50 yards from the back of Brown's house.  As they walked they decided Porter would stand to the side of the door out of sight while Stewart knocked on the door.  When

---

[5] Lauderdale County District Attorney Bilbo Mitchell testified Saunders was charged in September 1993 with aggravated assault for shooting into Brown's car, and that Brown was scheduled to testify about that incident before the Grand Jury on November 1, 1993 . [R. Vol. 8, pp. 435-437]

[6] Brown was apparently a bail bondsman.  [R. Vol. 7, p. 277-278]

Brown answered the door, Porter would shoot him.[7]  They arrived at Brown's house about 10:00 a.m., Stewart knocked, but Natasha Cole answered the door.  [R. Vol. 8, pp. 343-344, 394, 418]  Stewart had known Cole since they were children; they were raised in the same area and had gone to grade school together.  [R. Vol. 8, pp. 344, 380]  He did not know Cole was Bennie Brown's niece, or that she was living in Brown's house.  [R. Vol. 8, p. 381]  When Cole answered the door, she said, "Hello, Charlie Brown."  [R. Vol. 8, 396-397]  Stewart asked if Brown lived there.  She replied that he did and called Brown to the door. [R. Vol. 8, p. 344]

Stewart asked Brown to step outside, but Brown was barefoot, so he asked Stewart to step inside.  Stewart entered the house, but before he could shut the door, Porter turned the corner and shot Bennie Brown.  Porter and Stewart turned and ran back to Stewart's car.  When they got there, Stewart told Porter Natasha recognized him.  Porter handed Stewart the gun and said, "You know what you got to do."  Stewart returned to Brown's house by the same path, entered the house and walked around Brown's body.  He found Natasha Cole hiding in an upstairs closet, shot her and ran back to the car.  [R. Vol. 8, pp. 345-346]   Stewart felt it necessary to kill Cole "in order to get away with what we were doing at the time..."  He did not want Cole to identify him.  [R. Vol. 8, pp. 400-401]

Stewart and Porter then went back to Stewart's apartment, turned on the TV and lights to make it appear someone was there, and left.  They went to Palmer's, trying to get in touch with Saunders, but Saunders was not at his mother's house.  Stewart and Porter went to a barber shop, then to the Avenue, and then to the Sheeplo community outside Hattiesburg where they picked

---

[7]On questioning by Saunders' attorney, Stewart explained he had "done the last risk" when he and Porter robbed a convenience store with the gun, so it was Porter's turn to do the risk, *i.e.*, shoot Brown. [R. Vol. 8, p. 399]

up their friend Nakia Mason. Stewart testified Mason was supposed to be involved in the killing, that he and Porter had talked with him about it, but Mason was not there that Saturday morning, so Porter and Stewart did the job without him. [R. Vol. 8, pp. 346-347, 406] The three checked into the Dru's Inn near the south gate of Camp Shelby, where they spent the night.[8] Porter continued to call Saunders' cell phone from the motel room, and around 11:00 p.m. to midnight made contact. [R. Vol. 8, pp. 346-348; 407-408, 416-417] Early the next day (Sunday, October 31, 1993), Saunders knocked on their motel room door and told them to follow him to Gulfport. They traveled down Highway 49 to Highway 90 in Gulfport, where they turned left and went to a pavilion on the beach. Saunders, Porter and Stewart walked to the back of the pavilion, where Saunders paid Porter and Stewart $3000.00 each. Saunders asked Stewart if his name was "Carlos."[9] Stewart responded that it was, and Saunders told him he should not go back to Hattiesburg because the police were looking for Carlos. Saunders wanted Stewart to go with him to Texas, but Stewart refused. When Saunders learned Nakia Mason was in the car with Porter and Stewart, he suggested that Porter and Stewart kill Mason because he had seen Saunders with Porter and Stewart. [R. Vol. 8, pp. 348-351, 410]

Saunders told them he was going to be on the Gulf Coast all weekend. Stewart, Porter and Mason went to New Orleans, where they rented a room at a Days Inn motel off Reid Boulevard.[10] The next morning (Monday, November 1, 1993), Stewart called his mother to see if

---

[8] Stewart identified the Dru's Motel receipt dated 10/30/1993, which was introduced into evidence. [R. Vol. 8, p. 358]

[9] Saunders knew Stewart as "Charlie Brown." [R. Vol. 8, p. 348]

[10] Stewart identified the Days Inn receipt showing they checked into the New Orleans motel at 8:32 a.m. on October 31, 1993. The receipt was introduced into evidence. [R. Vol. 8, pp. 410-412, 418]

8

he had to go to work that day.  She told him he did not, but that he needed to come home.  Stewart figured the police were looking for him.  Porter, Stewart and Mason left New Orleans and drove back to Gulfport, MS, where they bought Mason a bus ticket.  They rented motel rooms at the Econo Lodge motel in Biloxi, where they stayed that night.[11]  Porter and Stewart put Mason on the bus the next morning (Tuesday, November 2, 1993), then went to Marietta, GA, just outside Atlanta, where they checked into a Motel 6 sometime late Tuesday night or in the early morning hours of Wednesday, November 3, 1993.  [R. Vol. 8, pp. 410, 419-420, 352-353, 378]  That night, Porter got beeped by Saunders, and he called Saunders.  The following day, Saunders arrived at the Georgia motel, and told Porter and Stewart there were nation-wide warrants for all three of them and that he (Saunders) was going back to Mississippi to turn himself in, because if they didn't catch up with Porter and Stewart, they could not hold Saunders more than 72 hours.  Saunders gave Porter and Stewart $150.00 each and left.  A few days later, Porter and Stewart were arrested in Atlanta.  [R. Vol. 8, pp. 352-354, 377, 420]

     Captain Bob Hopkins of the Hattiesburg Police Department was involved in investigating the Brown and Cole homicides.  He testified he took a telephone call from someone identifying himself as Herman Saunders, who was trying to contact Detective Dejarnette.  The caller said he had heard Dejarnette was trying to get in touch with him.  Hopkins told the caller Dejarnette was not in, but if he would leave his telephone number, Hopkins would have Dejarnette return the call.  The caller said he was on his cell phone, and gave Hopkins the number 543-3966.  Hopkins relayed this information to Detectives Dejarnette and Ken Ritchey.  Cellular South cell phone

---

[11]Stewart identified the Econo Lodge receipt which was introduced into evidence. [R. Vol. 8, pp. 359-361, 417-418]

records show this number as the account of Hiamon Owens, Jr. [R. Vol. 9, pp. 487-500, 537] The cell phone records were introduced into evidence. [R. Vol. 9, pp. 495-496]

Carson Hughes is the CEO of Telapex, Inc., which owns the entity which does business as Cellular South. [R. Vol. 9, pp. 518-519] Hughes testified the cell phone record tracks a cell phone wherever it is, and that two calls were received by the phone registered to Hiamon Owens, on October 31, 1993, while it was roaming in the Houston, TX area. The calls were received at 11 minutes after midnight and 15 minutes after midnight, and were forwarded under "follow-me-roaming." The calls could have originated anywhere; Hughes could testify only they came into the Hattiesburg system for forwarding. [R. Vol. 9, pp. 520-521; 530] The jury could reasonably find this testimony supported Stewart's testimony that Porter contacted Saunders around midnight after the murders occurred.

Hughes further testified the records show 19 calls made from the Gulf Coast on this phone on October 31, 1993 [R. Vol. 9, p. 526], which the jury could infer corroborates Stewart's testimony that he and Porter met with Saunders in Gulfport on October 31, 1993, that Saunders was on the Gulf Coast that weekend. On November 5, 1993, the phone was in Birmingham, AL and Jackson, MS. [R. Vol. 9, p. 527] On November 6, 1993, a call was made from this phone in Atlanta, GA [R. Vol. 9, pp. 545-546]; on November 8, 1993 the records show an Atlanta surcharge ("the use per day charge that is charged with having the phone turned on in somebody's roaming area"). The jury could reasonably find this evidence corroborative of Stewart's testimony that Saunders came to the Georgia motel, and told Stewart and Porter he was returning to Mississippi to turn himself in. In fact, counsel stipulated that Saunders turned himself in to Hattiesburg, MS authorities on November 9, 1993. [R. Vol. 9, p. 547]

Pathologist Stephen Hayne performed the autopsies on both Brown and Cole. He testified that each died from distant gunshot wound(s), that is the gun was no closer than one and a half to two feet from the victim when fired, as there was no evidence of tattooing about the wounds or gunpowder in them, no smudging, flame injury or powder residue in the wound tracks. [R. Vol. 8, pp. 322-331]

Saunders' sufficiency of evidence argument presents a question of state law as to whether the Mississippi capital murder statute would apply to the killing of a chance victim during the commission of a murder for hire. The state appellate court thoroughly analyzed this claim in light of the Mississippi capital murder statute and the facts of the case, and held that the State's statutory provision making murder for hire capital murder can apply to the killing of a chance victim during the commission of the murder for hire, stating:

> Saunders makes a technical legal argument concerning whether he could be guilty of capital murder of Natasha Cole. She was not the target of Saunders's murderous contract but got in the scheme's way. At most, Saunders alleges, he could be guilty of the simple murder of Cole. He then argues that the jury instructions did not permit conviction of simple murder.
> ***
> Saunders was indicted under the murder for hire subsection. Miss. Code Ann. § 97-3-19(2)(d). Saunders argues ... that [this subsection] cannot apply to the killing of Brown's niece, Natasha Cole. Her murder was not an explicit part of the contract. ... Saunders is not guilty of capital murder for Ms. Cole's death unless the statute can be reasonably interpreted to make him so.
> ***
> ... a murder for hire can be directed at one primary victim and several secondary targets. The victims within the contract can be named or unnamed. The capital murder statute criminalizes under the potential sentence of death the offering of money for the killing of other human beings. Each victim who is killed as an anticipated part of the overall agreement to murder one person is as much a part of the murder for hire as is the principal target. That is because the contract is not complete until the principal and all secondary targets are killed. Even though Stewart said that he decided to kill Ms. Cole, the jury could find that Saunders's bargain with Stewart and Porter implicitly included someone such as Ms. Cole: someone who got in the way.

11

> \*\*\*
> The relevant instruction permitted the jury to determine guilt if Ms. Cole was killed after Saunders set the killing of Bennie Brown in motion, when he "knew or should have known that lethal force and or death might be used against persons other than Bennie Brown, Sr. in order to accomplish the capital murder" of Brown. The important phrasing is that Saunders knew the killing of Ms. Cole was "in order to accomplish the capital murder" of the principal target of the contract. That is an adequate instruction for the jury's consideration of these issues. Holding one person responsible who, though not present, is a principal in the overall crime is standard criminal law.  The supreme court held "that when two or more persons act in concert, with a common design, in committing a crime of violence upon others, and a homicide committed by one of them is incident to the execution of the common design, both are criminally liable for the homicide.
> \*\*\*
> Even when the defendant is not present during the commission of the crime which resulted in the victim's death, he can nonetheless be found guilty of capital murder.  *Ballenger v. State*, 667 So.2d 1242, 1255 (Miss. 1995).
> \*\*\*
> We conclude that if the jury was properly instructed to determine whether a secondary killing was reasonably anticipated to be necessary in order to accomplish the contract killing, then that secondary killing is also part of the contract and the absent principal can be held guilty of capital murder.  The jury was so instructed.  The evidence supports the verdict.

*Saunders v. State*, 733 So.2d 325, 328-330 (Miss. App. 1998).

The foregoing demonstrates that under Mississippi law, the essential elements required to convict Saunders of the capital murder of Natasha Cole were: (1) Saunders hired killers to murder Bennie Brown, Sr.; (2) Saunders knew or should have reasonably anticipated that lethal force might be used against persons other than Brown to accomplish Brown's murder; (3) during the killing of Brown, the killers also murdered Cole to accomplish the capital murder of Brown. Jury Instruction S-9[12] instructed the jury of these elements [R. Vol. 4, p. 462]; and Jury Instructions S-8A and S-2A [R. Vol. 4, pp. 461, 456-457] gave the jury the option to consider

---

[12] The jury instructions given and refused are listed at R. Vol. 3, p. 442, and are listed by the typewritten designations that appear at the bottom of the last page of each instruction, rather than the handwritten numbers which appear at the top of each instruction.

and convict Saunders of the lesser included crime of murder of Natasha Cole.[13]  Jury Instruction D-23 (given as amended) defined murder for the jury.  [R. Vol. 4, pp. 471-472; Vol. 3, p. 442]  The jury was also instructed on the presumption of innocence/burden of proof, Instructions D-6, D-8A, and D-14 [R. Vol. 4, pp. 467, 468, 469]; the requirement that their verdict be unanimous, Instructions D-20 and C-4 [R. Vol. 4, p. 470, 448]; and the requirement that they consider and weigh the testimony of Carlos Stewart with great care and caution since he was an accomplice.  [R. Vol. 4, p. 452]   The properly instructed jury found Saunders guilty of capital murder of Natasha Cole.

A state court's decision on a question of state law is binding in federal court.  *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  Furthermore, in a federal habeas corpus case, the standard of review of sufficiency of the evidence requires that all evidence be examined in the light most favorable to the verdict, to determine whether any rational fact-finder could have found the essential elements of the crime proven beyond a reasonable doubt.  *Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999).   The evidence in this case, especially the testimony of Carlos Stewart, one of Saunders' hired killers, which the jury obviously believed, satisfies that standard.  The undersigned finds this claim without merit.

## NEED FOR AN EVIDENTIARY HEARING

When, as here, a petitioner for relief under Title 28 U.S.C. § 2254 has presented claims that are either contrary to law or plainly refuted by the record, an evidentiary hearing is not

---

[13] Had Saunders been convicted of simple murder of Cole, the only sentence he could have received for such crime would be precisely the same sentence he received for capital murder of Cole, *i.e.*, life imprisonment under Miss. Code Ann. § 97-3-21, without parole as a result of Saunders' habitual offender status, under Miss. Code Ann. § 99-19-81.

necessary.  *See U. S, v. Green,* 882 F.2d 999, 1008 (5th Cir. 1989); *U.S. v. Raetzsch*, 781 F.2d 1149, 1151 (5th Cir. 1986); *U.S. v. Fuller*, 769 F.2d 1095, 1099 (5th Cir. 1985).  Accordingly, Petitioner's claims in this case do not merit an evidentiary hearing.

## RECOMMENDATION

Having considered the Petition, Respondent's answer, the record, and the relevant legal authority, it is the recommendation of the undersigned that Petitioner's Application for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 be denied and this matter be dismissed.

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of this Proposed Findings of Fact and Recommendation on all parties by mailing a copy to each of them by Certified Mail, Return Receipt Requested.  Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within ten (10) days after being served with a copy unless the time period is modified by the District Court.  A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections.  Such party shall file the objections with the Clerk of the Court and serve the objections on all other parties.  A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a de novo determination by the District Court.  Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the

unobjected-to proposed **factual findings and legal conclusions** accepted by the district court.

*Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

      Signed, this the 29th day of August, 2007.

                                                    /s/ *Robert H. Walker*
                                                    ROBERT H. WALKER
                                                    UNITED STATES MAGISTRATE JUDGE